# United States Court of Appeals
## For the First Circuit

No. 08-2118

DECKY (FNU), IRAWATI (FNU), and DOMINIQUE AUDREY,

Petitioners,

v.

ERIC H. HOLDER, JR.,
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella and Boudin, <u>Circuit Judges</u>,
and Saris,<sup>*</sup> <u>District Judge</u>.

<u>William A. Hahn</u> and <u>Hahn & Matkov</u>, on brief for petitioners.
<u>Channah F. Farber</u>, Attorney, Office of Immigration Litigation,
U.S. Department of Justice, <u>Michael F. Hertz</u>, Acting Assistant
Attorney General, and <u>Jennifer L. Lightbody</u>, Senior Litigation
Counsel, on brief for respondent.

November 25, 2009

---

<sup>*</sup> Of the District of Massachusetts, sitting by designation.

TORRUELLA, **Circuit Judge**. Decky FNU,[1] together with his wife and daughter as derivative beneficiaries (collectively, "petitioners"), seek review of the decision of the Board of Immigration Appeals ("BIA") affirming the denial of applications for asylum under Section 208 of the Immigration and Nationality Act (the "Act"), for withholding of removal under Section 241(b)(3) of the Act, and for withholding of removal under the Convention Against Torture ("CAT"). Decky contends that the BIA erred when it determined that evidence of mistreatment experienced by petitioners in their native Indonesia, considered as a whole and in the context of relevant country conditions, failed to rise to the level of persecution within the meaning of the immigration laws. After careful consideration, we find that the BIA's decision was supported by substantial evidence and therefore deny the petition for review.

## I. Background

### A. Facts[2]

Decky and his wife, Irawati, are Indonesian citizens of Chinese ethnicity and Christian faith. Both were born and raised in the city of Surabaya on the island of Java. Decky was raised

---

[1] "First name unknown." Decky and his wife testified that they use only one name.

[2] These facts are drawn from the petitioners' testimony before the Immigration Judge ("IJ"), which the IJ deemed "generally credible."

Catholic but has followed the Protestant religion since marrying Irawati, a life-long Protestant.

From elementary school through high school, Decky was harassed on account of his ethnicity and faith. For example, Muslim students would often taunt him, saying things like "hey Chinese, give me your money." Decky acknowledges that he could have gone to a Catholic high school where he would not have been harassed; however, he chose not to do so because the Catholic school was farther from his home. He also admits that he was never deeply involved in Catholicism, although he attended Catholic church in Surabaya and Jakarta for approximately 10 years. During cross-examination, Decky was unable to describe the sacraments of the Catholic church.

In 1996, Decky moved from his hometown of Surabaya to Jakarta, where he worked as a supervisor in a tool factory. On May 12, 1998, riots broke out across the city. While on his way to work, Decky witnessed cars and stores being burned. He was stopped by a group of individuals he recognized as Muslim and ordered off his motorcycle. The group of men, while chanting "kill Chinese," poured gasoline on his motorcycle and set it on fire. They then attacked and beat Decky, although he was rescued by a passerby and taken to safety. Decky's face was swollen from the beating and his body was bruised, but he did not go to the hospital. After the assault, Decky remained at home for several days during which he

observed smoke from the riots all over the city. Nonetheless, Decky continued to live in Jakarta for four years following this incident in order to honor a commitment he had made to complete a project at work.

In 2000, Decky married Irawati. Irawati was also shunned as a child due to her Chinese ethnicity and faith. Around the age of twelve, Irawati began to experience instances of sexual harassment and abuse. On one occasion, she was taunted by Indonesian boys who grabbed her breasts and called her a Chinese "pig." At another point, someone slapped her face when she tried to defend herself from being fondled. She experienced similar incidents of sexual harassment through high school, although she stated that, as an adult, she learned to avoid such situations.

In 2002, Decky and Irawati moved back to Surabaya. Decky testified that, around this time, Christian churches were bombed in various locations throughout Indonesia, including near Surabaya. However, while Decky reports that he endured some insults in the form of "hurtful words," neither he nor Irawati suffered any physical harm following their return to Surabaya.

In 2004, the couple left for the United States with their daughter, Dominique Audrey. They arrived on non-immigrant visas, which they overstayed. Decky timely filed a Form I-589 asylum application within one year of his arrival, and named his wife and daughter as derivative beneficiaries. See 8 U.S.C. § 1158(b)(3)(A)

("A spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien."). He also filed an application for withholding of removal under Section 241(b)(3), for withholding of removal under the CAT, and for voluntary departure.

Decky's mother and nine brothers and sisters continue to live in Indonesia, although Decky maintains contact only with his mother. According to Decky, his mother "never feels safe" and believes that the situation in Indonesia is "not stable." In approximately 2005, Decky reports that Muslims threw rocks at his brother's house.

**B. Procedural History**

The petitioners testified before the IJ on June 13, 2006, and, on November 16, 2007, the IJ issued an oral decision. The IJ concluded that the evidence presented by petitioners failed to demonstrate that they suffered persecution while in Indonesia. With respect to Decky's 1998 assault, the IJ explained:

> While [Decky] suffered physical violence during the . . . incident, that took place during a riot that swept across Jakarta and other parts of Indonesia and amounted to a general national unrest which was eventually quelled by the government. As frightening and painful and it was, it was not directed at [Decky] in the form of persecution but was rather an eruption of the lawlessness over a

large area that was eventually brought under control by the government.

The IJ also determined that petitioners had not established a well-founded fear of future persecution, noting that Decky's large family continued to reside in Indonesia but had not experienced "one incident . . . where anyone suffered injury as a result of persecution based on their religion or ethnicity." Accordingly, the IJ denied the petitions and ordered removal to Indonesia.[3]

The petitioners appealed to the BIA, which issued a per curiam opinion on July 31, 2008 affirming the IJ's decision. The BIA explained that "the incidents described by [petitioners], considered individually and cumulatively, do not amount to past persecution." The BIA further held that the evidence presented by petitioners regarding the treatment of ethnic Chinese and Christians in Indonesia was insufficient to show that their fear of persecution was well-founded, particularly where a large number of family members continued to live in Indonesia "unharmed." This appeal followed.

## II. Legal Framework

### A. Standard of Review

Our review of the BIA's "legal rulings is de novo but is deferential as to findings of fact and the determination as to

---

[3] The IJ determined that petitioners were ineligible for voluntary departure because they were served with a Notice to Appear within one year of their arrival in the United States. Petitioners do not challenge this holding.

whether the facts support a claim of persecution." Jorqji v. Mukasey, 514 F.3d 53, 57 (1st Cir. 2008); see Seqran v. Mukasey, 511 F.3d 1, 5-6 (1st Cir. 2007) (explaining that deference is due not only to findings of fact but also to agency determinations about whether particular facts support a claim of persecution). Thus, our review of the BIA's fact-based denial of an asylum claim is limited to determining whether the agency's decision is supported by "substantial evidence." Attia v. Gonzáles, 477 F.3d 21, 23 (1st Cir. 2007). Under this standard, we will uphold the decision if it is supported "by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (internal quotation marks omitted). Reversal is warranted "only if 'any reasonable adjudicator would be compelled to conclude to the contrary.'" Scatambuli v. Holder, 558 F.3d 53, 58 (1st Cir. 2009)(quoting 8 U.S.C. § 1252(b)(4)(B)). "In other words, vacatur requires that the evidence point unerringly in the opposite direction." Bocova v. Gonzáles, 412 F.3d 257, 262 (1st Cir. 2005) (internal quotation marks and alterations omitted).

Where, as here, "the BIA adopts the IJ's opinion and discusses some of the bases for the IJ's decision, we have authority to review both the IJ's and the BIA's opinions." Piedrahita v. Mukasey, 524 F.3d 142, 144 (1st Cir. 2008) (internal quotation marks omitted).

## B. Applicable Law

When a petitioner brings claims both for withholding of removal and asylum, "[w]e focus on the petitioner's asylum claim because a claim for withholding of removal places a more stringent burden of proof on an alien than does a counterpart claim for asylum." Bocova, 412 F.3d at 262 (internal quotation marks omitted). Thus, if the asylum claim fails, so too does the claim for withholding of removal. Id.

In a claim for asylum, "the petitioner carries the burden of proving that he qualifies as a refugee by showing either that he has suffered past persecution or has a well-founded fear of future persecution on the basis of 'race, religion, nationality, membership in a particular social group, or political opinion.'" Journal v. Keisler, 507 F.3d 9, 12 (1st Cir. 2007) (quoting 8 U.S.C. § 1101(a)(42)). "To qualify as persecution, a person's experience must rise above unpleasantness, harassment, and even basic suffering." Jorgji, 514 F.3d at 57 (internal quotation marks omitted); see also Kho v. Keisler, 505 F.3d 50, 58 (1st Cir. 2007) ("Persecution, within the context of the immigration statutes, does not include all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." (internal quotation marks omitted)). "This threshold is not easily crossed." Orelien v. Gonzáles, 467 F.3d 67, 71 (1st Cir. 2006).

> Further, the state must be the source of or at least acquiesce in the persecution;

-8-

specifically, the persecution must either be the direct result of government action or government-supported action, or there must be some showing that the persecution is due to the government's unwillingness or inability to control the conduct of private actors.

Jorgji, 514 F.3d at 57.

If the petitioner establishes past persecution, he is entitled to a presumption that his fear of future persecution is well-founded; the burden then shifts to the government to show a change in country conditions in order to rebut that presumption. See 8 C.F.R. § 208.13(b)(1); Jorgji, 514 F.3d at 57. However, if the petitioner is unable to demonstrate past persecution, he may still qualify for asylum by establishing a well-founded fear of future persecution through "specific proof" that his "fear is both subjectively genuine and objectively reasonable." Castillo-Díaz v. Holder, 562 F.3d 23, 26 (1st Cir. 2009) (internal quotation marks omitted). "Demonstrating objectively reasonable fear requires showing that a reasonable person in her circumstances would fear persecution on account of a statutorily protected ground." Castillo-Díaz, 562 F.3d at 27 (internal quotation marks and alterations omitted).

## III. Discussion

### A. Past Persecution

Decky argues that the BIA erred when it concluded that the evidence presented by petitioners did not demonstrate past persecution. Specifically, he contends that under Sompotan v.

-9-

Mukasey, 533 F.3d 63 (1st Cir. 2008), the BIA should have recognized that the assault he experienced in the 1998 riots was motivated on protected grounds and was not, as the IJ concluded, a product of "general national unrest." Decky asserts that, with this experience properly factored into the analysis, the totality of evidence compels the conclusion that he suffered past persecution within the meaning of the immigration laws.[4]

In Sompotan, we determined that an arson committed against an ethnic Chinese petitioner during the May 1998 Jakarta riots was motivated on protected grounds, finding that the violence which precipitated the arson specifically targeted an ethnic Chinese neighborhood. Id. at 70-71. However, we denied Sompotan's petition for withholding of removal, concluding that the IJ's prior characterization of the 1998 riots as a "huge, spontaneous act of violence," though incorrect, was harmless. Id. at 70. In so doing, we emphasized "the isolated nature of the arson" and the "absence of physical harm" to the petitioners. Id. at 71. Nonetheless, in this appeal, Decky invokes Sompotan and contends that because he was physically harmed during the riots, the 1998

_____

[4] Decky attempts to characterize the BIA's reliance on Sompotan as an error of law triggering de novo review. However, whether mistreatment constitutes persecution and whether persecution was inflicted "on account of" a protected ground are generally questions of fact. Sompotan, 533 F.3d at 68; see Singh v. Mukasey, 543 F.3d 1, 4 (1st Cir. 2008) (same). We thus review the BIA's decision for substantial evidence.

assault, together with the totality of evidence regarding his past experience in Indonesia, requires a finding of past persecution.

Considering the record as a whole, we find that the BIA's conclusion that Decky failed to demonstrate past persecution is supported by substantial evidence. Thus, any error by the IJ in attributing the 1998 assault to "general national unrest" was harmless. See Sompotan, 533 F.3d at 70. First, we note that a petitioner's experience of physical harm is relevant, but it is only one consideration. See, e.g., Ruiz v. Mukasey, 526 F.3d 31, 37 (1st Cir. 2008) ("[T]he presence or absence of physical harm (and, indeed, the degree of harm inflicted) remains a relevant factor in determining whether mistreatment rises to the level of persecution."); see also Sompotan, 533 F.3d at 71 (absence of physical harm "not determinative"); Un v. Gonzáles, 415 F.3d 205, 210 (1st Cir. 2005) (explaining that physical harm is not a prerequisite for a finding of persecution; in appropriate circumstances, threats alone may suffice).

In this case, Decky suffered facial swelling and bruises on his body as a result of the assault. To minimize the degree of physical harm, the respondent points out that Decky's injuries did not compel him to go to the hospital for care. However, the evidence demonstrates that he was saved by a passerby, and that he was in the middle of a widespread riot against people of Chinese descent. As such, the failure to go to a hospital in this

-11-

situation does not support a reasonable inference that the injuries were not serious. While it would be impermissible to make the presence or absence of injury requiring medical attention into a sort of "acid test" for persecution, see Topalli v. Gonzáles, 417 F.3d 128, 132-33 (1st Cir. 2005) (citing Begzatowski v. INS, 278 F.3d 665, 670 (7th Cir. 2002)), here there is no indication that the IJ gave this factor overblown significance when he concluded that Decky's beating did not rise to the level of persecution contemplated by the law. See id. at 133 ("The BIA is certainly allowed to take into account the severity, duration, and frequency of physical abuse to determine whether the abuse extends beyond 'unpleasantness, harassment, and even basic suffering' to rise to the level of persecution.").

The critical factor driving our determination that substantial evidence supports a finding of no persecution in this case is the absence of evidence of systematic mistreatment of comparable severity to the beating he suffered in the 1998 riots. Decky remained in Jakarta for approximately four years following the assault, and in Indonesia for another two years, without further incident. Accordingly, the evidence supports the conclusion that the beating was an "isolated" event. Sompotan, 533 F.3d at 71; see, e.g., Bocova, 412 F.3d at 263 ("[M]istreatment ordinarily must entail more than sporadic abuse in order to constitute persecution . . . . An important factor . . . is

-12-

whether the mistreatment can be said to be systematic rather than reflective of a series of isolated incidents.").

As additional cumulative evidence of past persecution, Decky points to the harassment and discrimination he faced while growing up, the sexual harassment and abuse experienced by Irawati, and the general conditions of life for ethnic Chinese and Christians living in Indonesia, as reflected in petitioners' testimony and the documentary materials submitted. However, considering the totality of evidence before us, our cases compel the conclusion that mistreatment of the severity and duration suffered by petitioners does not rise to the level of persecution necessary to sustain a claim for asylum. See, e.g., Datau v. Mukasey, 540 F.3d 37, 39-40 (1st Cir. 2008) (no persecution where Indonesian of Christian faith, who appeared ethnically Chinese, experienced unwanted sexual advances and harassment from Muslim men, members of her church were threatened with death, her church was vandalized and set on fire, and her friend was raped in 1998 riots); Kho, 505 F.3d at 52-53 (no persecution where ethnic Chinese Indonesian of Christian faith was discriminated against by school administration, robbed by group of Muslims, and physically assaulted in the 1998 riots when a group of individuals looted his business); Susanto v. Gonzáles, 439 F.3d 57, 59 (1st Cir. 2006) (no persecution where ethnic Chinese Indonesian of Christian faith experienced forced relocation to another city for two months during

-13-

1998 riots, her home was vandalized, Church bombed, neighbor raped, she escaped an attempt by two men to sexually assault her at the age of 14 while calling her a "Chinese snob," and she was mugged at knifepoint and threatened).

Accordingly, while we do not wish to minimize the hardships petitioners experienced in Indonesia, the evidence does not compel a finding of past persecution. Therefore, we must affirm the BIA's determination. See 8 U.S.C. § 1252(b)(4)(B).[5]

## B. A Well-Founded Fear of Future Persecution

Because petitioners are unable to establish past persecution, we turn to whether they have demonstrated a well-founded fear of future persecution. The IJ determined that petitioners had established a genuine, subjective fear of returning to Indonesia; therefore, we focus on the objective component of this inquiry. A petitioner satisfies this objective component by producing "credible, direct, and specific evidence" supporting a fear of individualized persecution in the future, Guzmán v. INS, 327 F.3d 11, 16 (1st Cir. 2003) (internal quotation marks omitted), or by demonstrating "a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly

---

[5] Decky claims various other errors which he characterizes as "legal" in nature, such as the IJ's alleged failure to adequately take into account Dominique Audrey's age in its persecution analysis. However, these alleged errors all turn on whether the denial of Decky's petition was supported by substantial evidence. Because we find that it was, we decline to address these arguments.

situated to the applicant on account of" a protected ground. 8 C.F.R. § 1208.13(b)(2)(iii)(A).

Here, the evidence in the record does not compel the conclusion that petitioners will suffer individualized persecution if they return to Indonesia. We have observed that "[t]he fact that close relatives continue to live peacefully in the alien's homeland undercuts the alien's claim that persecution awaits her return." Budiono v. Mukasey, 548 F.3d 44, 50 (1st Cir. 2008) (internal quotation marks and alterations omitted); see, e.g., Sipayung v. Gonzáles, 491 F.3d 18, 21 (1st Cir. 2007) (evidence that petitioner's "other relatives continued to practice [Christianity in Indonesia], and none of them had ever been harmed," is "a rational bas[i]s on which to find that [petitioner] failed to show that he would more likely than not face future persecution"). Here, the BIA's determination that petitioners will not suffer individualized persecution is reasonably supported by the fact that Decky's nine brothers and sisters have remained in Indonesia without significant mistreatment, aside from one incident where Muslims threw stones at Decky brother's house.

Finally, Decky has not established a pattern or practice of persecution sufficient to qualify for asylum. Indeed, "[w]e have repeatedly affirmed the BIA's determinations . . . that there is no ongoing pattern or practice of persecution against ethnic Chinese or Christians in Indonesia." Kho, 505 F.3d at 54; see,

-15-

e.g., Budiono, 548 F.3d at 50.  The evidence in the record does not compel a conclusion to the contrary in this case.  Among other things, the 2005 State Department Report for Indonesia, the most recent in the record, states that "instances of discrimination and harassment of ethnic Chinese declined compared with previous years."  While the documentary materials acknowledge that ethnic Chinese and Christians continue to face difficulties not encountered by the Muslim majority, this evidence does not compel a finding of pattern or practice of persecution.

Accordingly, we conclude that the agency's determination that petitioners failed to establish a well-founded fear of future persecution was supported by substantial evidence and therefore affirm.  Because we conclude that petitioners are ineligible for asylum, we also affirm the agency's determination that they fail to qualify for withholding of removal.  See, e.g., Bocova, 412 F.3d at 262.[6]

## IV. Conclusion

Because the BIA's holding is supported by substantial evidence in the record, we deny the petition for review.

**Denied**.

---

[6] Decky advances no argument with respect to his CAT claim.  Thus, this claim is waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).